IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **22-10509-JJ**

United States of America,

Appellee,

- versus -

Lawrence Curtin,

Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

BRIEF FOR THE UNITED STATES

> Juan Antonio Gonzalez
> United States Attorney
> Attorney for Appellee
> 99 N.E. 4th Street
> Miami, Florida 33132-2111
> (305) 961-9226

Lisa Tobin Rubio
Chief, Appellate Division

Brittany Bull Panuccio
Assistant United States Attorney

Jason Wu
Assistant United States Attorney

Of Counsel

**United States v. Lawrence Curtin, Case No. 22-10509-JJ**

**Certificate of Interested Persons**

In compliance with Fed. R. App. P. 26.1 and 11th Circuit Rules 26.1 and 28-1, the undersigned certifies that the list set forth below is a complete list of the persons and entities previously included in the CIP included in the appellant's initial brief, and also includes additional persons and entities (designated in bold face) who have an interest in the outcome of this case and were omitted from the appellant's CIP.

Altonaga, Hon. Cecilia M.

Bharathi, Sowmya

Caruso, Michael

Curtin, Lawrence F.

Fajardo Orshan, Ariana

Gonzalez, Juan Antonio

Jayanthi, Srilekha

**Jordan, Hon. Adalberto**

Jung, Hon. William F.

**King, Hon. James Lawrence**

Lopez, Alejandra Lizzette

**United States v. Lawrence Curtin, Case No. 22-10509-JJ**

**Certificate of Interested Persons (Cont'd)**

Lopez, Bernardo

Louis, Hon. Lauren Fleischer

Medetis, Maria

Otazo-Reyes, Hon. Alicia M.

**Panuccio, Brittany Bull**

Rosenzweig, Will

Rubio, Lisa Tobin

**Torres, Hon. Edwin G.**

United States of America

**Wu, Jason**

Counsel certifies that no publicly traded company or corporation has an

interest in the outcome of this case or appeal.

s/ *Jason Wu*
Jason Wu
Assistant United States Attorney

**Statement Regarding Oral Argument**

The United States of America respectfully suggests that the facts and legal arguments are adequately presented in the briefs and record before this Court and that the decisional process would not be significantly aided by oral argument.

# Table of Contents

**Page**:

Certificate of Interested Persons ............................................................ c-1

Statement Regarding Oral Argument ....................................................... i

Table of Contents ..................................................................................... ii

Table of Citations .................................................................................... iv

Statement of Jurisdiction ......................................................................... x

Statement of the Issues .............................................................................. 1

Statement of the Case:

    1.    Course of Proceedings and Disposition in the Court Below ...... 1

    2.    Statement of the Facts ........................................................... 3

    3.    Standards of Review ............................................................. 6

Summary of the Argument ...................................................................... 7

Argument

I.    There Was Sufficient Evidence that Curtin Threatened a Magistrate Judge When He Wrote that He Was "Threatening [Her] with Death and Bodily Harm." ............................................................................. 9

    A.    Curtin Intentionally or Knowingly Mailed a True Threat, Which Violated § 876(c). ...................................................... 10

# Table of Contents

## (continued)

**Page:**

B.     Curtin Also Violated § 115(a)(1)(B) by Threatening a Judge..... 15

II.    The District Court Did Not Err by Refusing To Dismiss the Case Due to Delays in the Competency Restoration Process. .................... 16

    A.     Background ............................................................... 16

    B.     Dismissal Was Not the Right Remedy for Missing § 4241(d)(1)'s Deadline........................................................... 21

III.   The Southern District Judge Did Not Plainly Err by Ruling on Pre-Trial Matters Before Curtin Asked for a Judge from Another District. ........................................................................... 27

IV.   The District Court Did Not Clearly Err by Finding that Curtin's Threat Involved Some Deliberation. .................................. 33

    A.     Sentencing Background........................................... 33

    B.     The District Court Did Not Clearly Err by Finding Curtin's Threat Involved Deliberation. ................................ 37

V.     Curtin's 60-Month Sentence Was Substantively Reasonable Because It Addressed His Pattern of Misconduct............................. 39

Conclusion ........................................................................ 44

Certificate of Compliance............................................................ 45

Certificate of Service ............................................................. 46

## Table of Citations

**Cases:**                                                                                      **Page:**

*Anderson v. City of Bessemer City, N.C.*,

   470 U.S. 564 (1985) ................................................................ 37

*Carpenter v. United States*,

   484 U.S. 19 (1987) .................................................................. 10

*Clemens v. U.S. Dist. Ct. for the Central Dist. of Calif.*,

   428 F.3d 1175 (9th Cir. 2005) .............................................. 30, 32

*Dolan v. United States*,

   560 U.S. 605 (2010) ..................................................... 19, *passim*

*Drope v. Missouri*,

   420 U.S. 162 (1975) ................................................................ 21

*Elonis v. United States*,

   575 U.S. 723 (2015) ..................................................... 10, 11, 16

*Gall v. United States*,

   552 U.S. 38 (2007) .............................................................. 39, 40

*In re Moody*,

   755 F.3d 891 (11th Cir. 2014) ....................................... 28, *passim*

*In re Nettles*,

   394 F.3d 1001 (7th Cir. 2005) ................................................ 30

# Table of Citations (Continued)

**<u>Cases</u>:**                                                                                          **<u>Page</u>:**

*Jackson v. Indiana*,

   406 U.S. 715 (1972) ................................................................................ 21

*United States v. Alaboud*,

   347 F.3d 1293 (11th Cir. 2003) ..........................................................11, 13

*United States v. Anton*,

   546 F.3d 1355 (11th Cir. 2008) ................................................................ 6

*United States v. Bachmeier*,

   8 F.4th 1059 (9th Cir. 2021) ................................................................... 14

*United States v. Berger*,

   375 F.3d 1223 (11th Cir. 2004) ................................................................ 6

*United States v. Brannan*,

   562 F.3d 1300 (11th Cir. 2009) .............................................................. 26

*United States v. Callahan*,

   702 F.2d 964 (11th Cir. 1983) ................................................................ 11

*United States v. Capers*,

   708 F.3d 1286 (11th Cir. 2013) ......................................................... 6, 15

*United States v. Donofrio*,

   986 F.3d 1301 (11th Cir. 1990) .............................................................. 26

## Table of Citations (Continued)

<u>**Cases**</u>:                                                                                    <u>**Page**</u>:

*United States v. Duenas*,

   891 F.3d 1330 (11th Cir. 2018) .................................................................. 15

*United States v. Early*,

   686 F.3d 1219 (11th Cir. 2012) .................................................................... 7

*United States v. Fleury*,

   20 F.4th 1353 (11th Cir. 2021) .................................................................. 10

*United States v. Howard*,

   947 F.3d 936 (6th Cir. 2020) .................................................................... 13

*United States v. Irey*,

   612 F.3d 1160 (11th Cir. 2010) ........................................................... 39, 40

*United States v. Isaac*,

   987 F.3d 980 (11th Cir. 2021) .................................................................. 42

*United States v. Ivers*,

   967 F.3d 709 (8th Cir. 2020) ............................................................... 12, 16

*United States v. Lejarde-Rada*,

   319 F.3d 1288 (11th Cir. 2003) ................................................................ 29

*United States v. Lopez*,

   562 F.3d 1309 (11th Cir. 2009) ................................................................ 23

## Table of Citations (Continued)

**Cases:**                                                      **Page:**

*United States v. Magassouba,*

   544 F.3d 387 (2d Cir. 2008)........................................................ 19

*United States v. Montalvo-Murillo,*

   495 U.S. 711 (1990) ...........................................................24, 25

*United States v. Moody,*

   977 F.2d 1420 (11th Cir. 1992) ................................................. 30

*United States v. Olano,*

   507 U.S. 725 (1993) ...........................................................28, 29

*United States v. Philidor,*

   717 F.3d 883 (11th Cir. 2013)................................................... 42

*United States v. Rivera-Rodriguez,*

   2022 WL 1234675 (11th Cir. Apr. 27, 2022) ............................ 10

*United States v. Rothenberg,*

   610 F.3d 621 (11th Cir. 2010)..................................................... 7

*United States v. Russell,*

   322 F. App'x 920 (11th Cir. 2009) ........................................... 38

*United States v. Santos,*

   553 U.S. 507 (2008) ................................................................. 14

## Table of Citations (Continued)

**Cases:**                                                                **Page:**

*United States v. Schwarzbaum*,

    24 F.4th 1355 (11th Cir. 2022)...................................................................... 42

*United States v. Scott*,

    245 F. App'x 942 (11th Cir. 2007) .............................................................. 40

*United States v. Shelley*,

    405 F.3d 1195 (11th Cir. 2005)................................................................... 25

*United States v. Stevenson*,

    126 F.3d 662 (5th Cir. 1997) ...............................................................37, 38

*United States v. Stokes*,

    347 F.3d 103 (4th Cir. 2003) ...................................................................... 38

*United States v. Will*,

    449 U.S. 200 (1980) .................................................................................... 43

*United States v. Williams*,

    526 F.3d 1312 (11th Cir. 2008).................................................................... 7

*United States v. Wright-Darrisaw*,

    781 F.3d 35 (2d Cir. 2015) ............................................................ 37, 38, 39

*Virginia v. Black*,

    538 U.S. 343 (2003) ..............................................................................10, 11

## Table of Citations (Continued)

**Statutes & Other Authorities:**                                    **Page:**

18 U.S.C. § 115 ................................................................2, 9, 15

18 U.S.C. § 875 ..................................................................... 15

18 U.S.C. § 876 ............................................................1, *passim*

18 U.S.C. § 3142 .................................................................... 24

18 U.S.C. § 3231 ..................................................................... x

18 U.S.C. § 3553 ...........................................................36, *passim*

18 U.S.C. § 4241 ...........................................................1, *passim*

28 U.S.C. § 455 ..................................................................... 28

28 U.S.C. § 1291 ..................................................................... x

Fed. R. App. P. 4 .................................................................... x

Fed. R. App. P. 26.1 ............................................................. c-1

Fed. R. App. P. 32 .................................................................. 45

**United States Sentencing Guidelines:**                             **Page:**

USSG § 2A6.1 ..............................................................1, *passim*

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Southern District of Florida in a criminal case. Before trial, the case was reassigned to a Middle District of Florida judge, who presided over Lawrence Curtin's trial and sentencing (DE97). The district court entered its judgment against Curtin on February 15, 2022 (DE215). The district court had jurisdiction to enter the judgment pursuant to 18 U.S.C. § 3231. Curtin filed a timely notice of appeal one day later (DE217); *see* Fed. R. App. P. 4(b). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## Statement of the Issues

I.    Whether there was sufficient evidence to support Curtin's two threat convictions, which stemmed from him writing, "I am threatening [Magistrate Judge] Maynard with death and bodily harm" and "threatening Maynard who is a woman of color with death."

II.    Whether the district court should have dismissed the indictment because it took more than four months—the time set by 18 U.S.C. § 4241—to assess how to restore Curtin's competency.

III.    Whether the district court plainly erred by not recusing itself sua sponte from deciding pretrial matters.

IV.    Whether the district court clearly erred when it did not reduce Curtin's offense level by four levels under USSG § 2A6.1(b)(6), which applies to a single threat made with little or no deliberation.

V.    Whether the district court abused its discretion by varying upward to a 60-month sentence based on Curtin's pattern of sending violent messages to judges.

## Statement of the Case

### 1.    <u>Course of Proceedings and Disposition in the Court Below</u>

In September 2020, the government charged Curtin by complaint with mailing a threat, which violated 18 U.S.C. § 876(c) (DE1). The complaint

alleged that Curtin threatened Magistrate Judge Maynard in a court filing (DE1:5).

A prison psychologist diagnosed Curtin with schizophrenia, prompting the parties to agree that he was incompetent (DE24:1-2). So the district court committed him to psychiatric care to restore his competency (DE24).

In the meantime, a Southern District grand jury returned a superseding indictment charging Curtin with violating § 876(c) (Count 1) and with threatening a judge, which violated 18 U.S.C. § 115(a)(1)(B) (Count 2) (DE65).

In July 2021, Curtin moved to dismiss the case based on delays in his competency treatment (DE75; DE78). According to Curtin, the Bureau of Prisons missed its four-month deadline for assessing whether it could restore his competency (DE75:1). The district judge denied the motion (DE79). Although the four-month period had expired, the court held that dismissal was not the right remedy (DE79:6-9).[1] Curtin's treatment ultimately proved successful, and the court found him competent to proceed (DE243:3-4).

A year after the case began, Curtin asked that all Southern District judges recuse themselves because the victim was a Southern District magistrate judge (DE95). The government did not oppose this request. When the court granted

_____

[1] Curtin's second claim concerns this decision, so Part II.A of this brief describes this motion in more detail.

it, a judge from the Middle District of Florida took over the case for trial and sentencing (DE97).

Curtin went to trial in November 2021 (DE245; DE246). Although he argued that his statements were "sarcastic" and not real threats (DE246:104), the jury found him guilty of both charges (DE197).

The district court sentenced Curtin to 60 months' imprisonment, an upward variance from his 27- to 33-month advisory Guidelines range (DE215).[2]

This timely appeal followed (DE217).

## 2.    <u>Statement of the Facts</u>

Lawrence Curtin lost a Florida state court lawsuit. Blaming the presiding judge for that outcome, he turned to federal court, where he brought several actions claiming that the state judicial system was corrupt (DE245:150-51). By 2020, despite losing at least five earlier cases, Curtin had not lost heart (DE245:151-52, 163-64). He filed another complaint, which alleged that the entire "Florida state court system" was "an organized crime operation run by lawyers for the benefit of lawyers" (GX5:1).

The district judge referred two preliminary matters to Magistrate Judge Maynard (DE245:129, 152-53, 160). As the only magistrate judge in the

---

[2] Part IV.A describes Curtin's sentencing in more detail.

Southern District's Fort Pierce division, Magistrate Judge Maynard also had participated in Curtin's earlier civil cases (DE245:150-51). In August 2020, she issued a report and recommendation advising the district court to dismiss Curtin's latest broadside against the Florida judiciary (DE245:161).

Curtin, who was representing himself, mailed in his objections to that report (DE245:124-25; GX1). He began by disagreeing with Magistrate Judge Maynard's ruling (GX1:2). But his tone soon grew more personal. Curtin railed that "Maynard makes things up," and that her report contained "fabrications" and "absurd claim[s]" (*id.*). Referring to a complaint filed against the original state judge, he asked, "Where in my June 23, 2018 letter do I threaten death or bodily harm to [Judge] Croom? No where!" (*id.*). He insisted that Magistrate Judge Maynard was "unable to understand" that he "address[ed] a letter to the [state judicial commission] to threaten a judge[']s position," not "a judge[']s person" (*id.*). Curtin added that, in his eyes, Magistrate Judge Maynard had aided and abetted the state courts: she "knew about the defendants refusing my heart medication in an effort to kill me yet she covered it up" (GX1:3).

Curtin then included a link to a video clip, "Road to Glory," which he had made (DE246:33-34; GX1:3). The scene depicted Curtin in a church, walking up to the pulpit and taking a black preacher's hand (DE246:31; GX3). After the link, Curtin wrote: "It is obvious from the totality of words in the song

4

including its title that I am threatening Maynard with death and bodily harm"
(GX1:3). He continued: "Also by holding onto the hand of the preacher of color
that I am threatening Maynard who is a woman of color with death" (*id.*). Here
is that part of his filing:

**IT IS OBVIOUS FROM THE TOTALITY OF WORDS IN THE SONG INCLUDING ITS
TITLE THAT I AM THREATENING MAYNARD WITH DEATH AND BODILY HARM.
ALSO BY HOLDING ONTO THE HAND OF THE PREACHER OF COLOR THAT I AM
THREATENING MAYNARD WHO IS A WOMAN OF COLOR WITH DEATH.**

Curtin signed the final page (*id.*). In handwritten postscripts, he added that
he "tried to deliver" the document to the clerk's office but found the office
closed, so he "sent [it] by US Mail" (*id.*).

Magistrate Judge Maynard has served as a magistrate judge in Fort Pierce
since 2017 (DE245:145). When she read the last page of Curtin's objections, she
saw that it "threatened [her] with death and bodily injury" (DE245:165). Judge
Maynard is, as Curtin suggested, an African-American woman (DE245:167,
212). And her father is a pastor in the Fort Pierce area, where Curtin lives (*id.*).
In earlier court filings, Curtin had referred to other details about Magistrate
Judge Maynard's background that were not in her court website biography
(DE245:157, 167, 212; GX4:4). She took Curtin's words seriously and called the
United States Marshals Service (DE245:168).

The clerk who received this filing was also alarmed, describing it as something she had never seen in her nearly 32-year career (DE245:117, 132). Like the judge, she reached out to the marshals with her concerns (DE245:132-33).

The Marshals Service began investigating after seeing the message (DE246:35). As the case agent put it, the statements "threatening Maynard with death and bodily harm" and "threatening Maynard, who is a woman of color, with death," were "trigger words" (*id.*). Both the "threat of death" and that Curtin had "writ[ten] it twice" "jumped out" in his view (DE246:36).

### 3.    <u>Standards of Review</u>

This Court reviews the sufficiency of the evidence de novo. *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013). But it "consider[s] the evidence in the light most favorable to the Government, and draw[s] all reasonable inferences and credibility choices in the Government's favor." *Id.* (internal quotation marks omitted).

This Court reviews statutory interpretation and constitutional questions de novo. *United States v. Anton*, 546 F.3d 1355, 1357 (11th Cir. 2008).

When a party raises a recusal claim for the first time on appeal, this Court reviews for plain error. *United States v. Berger*, 375 F.3d 1223, 1227 (11th Cir. 2004).

For sentencing claims, this Court reviews factual findings for clear error and legal questions de novo. *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010). This Court reviews whether a sentence is reasonable under "a deferential abuse of discretion standard." *United States v. Early*, 686 F.3d 1219, 1221 (11th Cir. 2012). And the party challenging the sentence bears the burden of showing that it is unreasonable. *United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008).

## Summary of the Argument

Curtin raises three challenges to his conviction and two to his sentence, none of which have merit.

Curtin first claims that the government did not prove the intent and true threat elements of his charges. As a reminder, Curtin wrote: "It is obvious from the totality of words in the song including its title that I am threatening Maynard with death and bodily harm. Also by holding onto the hand of the preacher of color that I am threatening Maynard who is a woman of color with death" (GX1:3). His words speak for themselves. He described his own statements as "obvious . . . threat[s]" of "death" and said it twice to make his meaning unmistakable. The jury had ample evidence to convict him.

Next, Curtin argues that the court should have dismissed his case because it took too long to assess his competency. Curtin's hospitalization did exceed the

7

four-month assessment period allowed under 18 U.S.C. § 4241(d)(1). But Curtin ignores the basis for the district court's ruling. After agreeing that his evaluation took too long, the court held that dismissal was not an appropriate remedy because § 4241(d)(1) was a time-related directive. Curtin never confronts that question in his brief, but the district court got it right. Section 4241(d)(1) never tells courts to dismiss prosecutions for missing its deadlines.

Curtin also faults his Southern District judge for not recusing herself before he moved to reassign the case. This claim is subject to plain-error review, and he cannot satisfy that standard. While judges should recuse when they were targeted or could have been hurt by a defendant's acts, nothing compels all judges in a district to recuse simply because the victim is their colleague.

Turning to his sentence, Curtin says that the district court should have reduced his offense level by 4 levels because his threat evinced little or no deliberation. The district court did not clearly err by rejecting his view. Curtin's threat was not an excited utterance. He made it in a letter that he mailed to the court, after first trying to file it in person. Because he had many chances to reconsider, his threat evinced more than little or no deliberation.

Finally, Curtin's sentence was substantively reasonable even though the court varied upward to 60 months' imprisonment. Magistrate Judge Maynard was the latest in a series of judges that Curtin targeted. In letters dating back to

the mid-2000s, Curtin wrote about judges being killed, the use of bombs, and "blow[ing one judge's] brains out of his head." The sentencing court did not abuse its discretion by weighing this pattern of conduct against him.

## Argument

### I.    There Was Sufficient Evidence that Curtin Threatened a Magistrate Judge When He Wrote that He Was "Threatening [Her] with Death and Bodily Harm."

The government proved that Curtin harbored the intent needed for both convictions. The government also proved that a reasonable person would take Curtin's statements as a serious threat of violence. On both fronts, the most powerful evidence was what Curtin said: "I am threatening Maynard with death and bodily harm" and "threatening Maynard who is a woman of color with death" (GX1:3).

Curtin's first charge punishes "knowingly [mailing] any communication . . . addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another." 18 U.S.C. § 876(c). And his second covers "threaten[ing] to assault . . . or murder" a judge "with intent to retaliate against" the judge for how she performed her official duties. 18 U.S.C. § 115(a)(1)(B). Curtin treats the two charges as interchangeable, *see* (Br.:23, 31), but they have distinct elements. So this brief addresses them separately, although the evidence overlaps for the

most part.

## A.    Curtin Intentionally or Knowingly Mailed a True Threat, Which Violated § 876(c).

To prove a § 876(c) charge, the government must show that (1) the defendant sent a message through the mail; (2) his mailing contained a true threat; and (3) he intended to threaten the victim or knew that his statement would "be viewed as a threat." *United States v. Rivera-Rodriguez*, 2022 WL 1234675, at *1 (11th Cir. Apr. 27, 2022) (unpublished) (listing elements of 18 U.S.C. § 875(c) charge). Curtin focuses his fire on the last two elements: that the statement must be a "true threat," *Virginia v. Black*, 538 U.S. 343, 359 (2003); and that he intended or knew that the message would be taken as a threat, *see Elonis v. United States*, 575 U.S. 723, 740 (2015) (holding that § 875(c) requires this element, even though not expressly stated in its text).[3]

1.    The "true threat" element requires a "statement[] where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual." *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021) (quoting *Black*, 538 U.S. at 359). But the "speaker

---

[3] The government treats § 876(c) and § 875(c) as interchangeable because these two companion provisions mirror each other. Section 876(c) covers threats sent through the mail, while § 875(c) applies to phone and internet communications. *Cf. Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) (mail and wire fraud statutes call for "the same analysis").

10

does not have to actually intend to carry out the threat." *Id.* The question is whether a reasonable person would take the statement as a threat based on its context. *See United States v. Alaboud*, 347 F.3d 1293, 1296-98 (11th Cir. 2003), *abrogated on other grounds by Elonis*, 575 U.S. 723. A message's content, tone, and delivery are all relevant factors. *See id.*

Curtin's statement was "threatening on its face." *United States v. Callahan*, 702 F.2d 964, 966 (11th Cir. 1983) (affirming conviction of a defendant who stated it was "essential" that the President and Vice President be assassinated). Curtin not only used the word "threat" in his threat; he also repeated twice that he was "threatening" Magistrate Judge Maynard with "death" (GX1:3). Notably, Curtin's statement singled out the judge as a "woman of color," which evokes racially motivated violence (*id.*).

For good measure, the setting and tone amplified the threat. Curtin's diatribe erupted while he was objecting to the magistrate judge's adverse report—which followed other cases in which the judge had recommended ruling against him. Although he began with legal arguments, he soon escalated to personal attacks. Curtin accused Magistrate Judge Maynard of "mak[ing] things up" and being "unable to understand" his position (GX1:2). He then alleged that the judge knew about an "effort to kill me yet she covered it up" (GX1:3). Because tone matters, it is worth looking at how Curtin's statement appeared:

11

**I ALSO NAMED MAYNARD AS AN ADDER AND ABETTER. MAYNARD KNEW
ABOUT THE DEFENDANTS REFUSING MY HEART MEDICATION IN AN EFFORT TO
KILL ME YET SHE COVERED IT UP.**

**https://www.youtube.com/watch?v=a2vUNuX5HgI**

**IT IS OBVIOUS FROM THE TOTALITY OF WORDS IN THE SONG INCLUDING ITS
TITLE THAT I AM THREATENING MAYNARD WITH DEATH AND BODILY HARM.
ALSO BY HOLDING ONTO THE HAND OF THE PREACHER OF COLOR THAT I AM
THREATENING MAYNARD WHO IS A WOMAN OF COLOR WITH DEATH.**

Both the all-caps font and the enlarged part ("she covered it up") suggested, to
any reasonable viewer, that his rage was genuine. It was reasonable to conclude
that the ensuing threat also was genuine. *See, e.g.*, *United States v. Ivers*, 967 F.3d
709, 717-20 (8th Cir. 2020) (affirming § 875(c) and § 115(a)(1)(B) convictions of
a defendant who said to attorneys, "You don't know the 50 different ways I
planned to kill [a judge]" who ruled against him).

Yet Curtin insists that this case never belonged in the jury's hands. To
him, the linked video clip dispels any notion that his ensuing words—again,
those words being, "I am threatening Maynard with death and bodily harm"—
were a threat (Br.:29-30).

His view suffers from two flaws. For one thing, attaching a random video
to a threat would not negate its meaning for many reasonable readers. If a person
sent a birthday greeting card but wrote inside, "I am going to slaughter you and
your family," most recipients would take that seriously. The bizarre vehicle for

12

the threat could, if anything, amplify the terror. *See Alaboud*, 347 F.3d at 1297 (observing that a threat conveyed with a "calm voice" could have "a chilling effect given the violent message he was conveying"). Curtin asks this Court to rule that a death threat loses its bite when accompanied by something innocuous. Taken to its extreme, that ruling would free anyone to terrorize another person by prefacing each threat with a benign movie clip. *See United States v. Howard*, 947 F.3d 936, 947-49 (6th Cir. 2020) (affirming conviction for a threat against a former Attorney General, which defendant claimed was a harmless, "nonsensical diatribe").

Also, Curtin's chosen clip increased the victim's fear because of her background. The video features Curtin approaching a black preacher (GX3), and Magistrate Judge Maynard's father is a pastor in the community where Curtin lives (DE245:167). Thus, a reasonable viewer could infer that Curtin was suggesting that he knew where to find the judge's father. The clip's title—"Road to Glory"—and soundtrack also left room for a darker interpretation. Because the word "glory" may refer to heaven,[4] sending that video to a pastor's daughter

---

[4] *See, e.g.*, Romans 8:18, New International Bible ("[O]ur present sufferings are not worth comparing with the glory that will be revealed in us."); 1 Peter 5:10, New International Bible ("And the God of all grace, who called you to his eternal glory in Christ, after you have suffered a little while . . . ."). The sentencing judge agreed with this view based on his personal experience, while cautioning that he put no weight on it in his decision (DE237:7-8).

could allude to her imminent death—exactly what Curtin threatened to deliver in the next two lines.

2.   As for the *Elonis* element, Curtin's actions established that he knew or intended that his statement would be construed as a threat. Intent or "knowledge must almost always be proved" through "circumstantial evidence." *United States v. Santos*, 553 U.S. 507, 521 (2008). And there was plenty of that here. But the jury also heard direct evidence through Curtin's own words. As he put it, "it is *obvious*" from the song, "including its title," that he was "threatening Maynard with death and bodily harm" (GX1:3 (emphasis added)). Thus, Curtin recognized that people would interpret his words as a threat.

The circumstances confirm as much. Although Curtin downplays his threats by pointing out that they came in a court filing (Br.:31-32), that fact cuts against him. His menacing words did not come out of nowhere. He had an axe to grind with the judge. And his promises of "death or bodily harm" capped off a long list of grievances against her. Their antagonistic history explains why he intended (or knew) that the judge would take his threats seriously. *See United States v. Bachmeier*, 8 F.4th 1059, 1065 (9th Cir. 2021) (holding that there was overwhelming evidence of defendant's subjective intent to threaten a judge based on threat made in letter asking for judicial reassignment).

It is unclear why, but Curtin also discusses many facts outside the trial

record. Most hurt his cause. For instance, he summarizes his earlier state prosecution for threatening Judge Croom (Br.:25-26). If anything, that episode would corroborate his intent under Rule 404(b). Since the jury never heard about it, however, it is irrelevant.

At bottom, he asks this Court to draw inferences in his favor, contrary to the standard of review. *See Capers*, 708 F.3d at 1296. Sure, he admits, he threatened a judge with death and bodily harm; but he was not being serious. He argued the same thing to the jury (DE246:104), and they rejected his claims. On appeal, offering an alternative innocent account is not enough. "It is not necessary that the evidence exclude every reasonable hypothesis of innocence . . . , provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Duenas*, 891 F.3d 1330, 1333 (11th Cir. 2018) (internal quotation marks omitted).

## B.     Curtin Also Violated § 115(a)(1)(B) by Threatening a Judge.

Curtin's second charge required that he (1) make a true threat to assault or murder a judge; (2) "with intent to retaliate" against her "on account of the performance of official duties." 18 U.S.C. § 115(a)(1)(B).

Curtin suggests that *Elonis* applies to this statute as well (Br.:31). But *Elonis* says nothing about § 115(a)(1)(B). *Elonis* inferred an intent requirement in 18 U.S.C. § 875(c) because the statute's text lacked a mental-state element that

15

would "separate wrongful conduct from otherwise innocent conduct." 575 U.S. at 736 (internal quotation marks omitted). In contrast, § 115(a)(1)(B) already has an express element—"intent to retaliate"—that addresses that concern. *See Ivers*, 967 F.3d at 721.

In any event, the same evidence supports this conviction. Curtin made his death threats after complaining that Magistrate Judge Maynard misapplied the law, that she "ma[de] things up," and that she "covered . . . up" the defendants' actions (GX1:2-3). In short, he was retaliating against her because she recommended dismissing his lawsuit.

## II.    The District Court Did Not Err by Refusing To Dismiss the Case Due to Delays in the Competency Restoration Process.

### A.    Background

After Curtin was arrested, the court detained him at the Miami Federal Detention Center. Later, the court found that Curtin was incompetent and committed him for treatment under 18 U.S.C. § 4241(d). Due to logistical issues, however, it took four months to hospitalize him at Federal Medical Center Devens. By statute, Devens had four months to assess "whether there [was] a substantial probability" that Curtin could "attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(1). Curtin moved the court to dismiss his charges when Devens held him for more than four months, but the district court denied the motion. Instead, the judge ordered Devens to transfer

Curtin back to Miami. Devens complied with that order and completed the transfer several weeks later. In total, Curtin spent about five months at Devens, which restored his competency.

Here is a more detailed timeline:

- August 24, 2020 – Curtin was arrested.

- September 3, 2020 – The court ordered that Curtin be detained based on the "serious risk that he will threaten or attempt to threaten" the victim again (DE6:1).

- November 24, 2020 – The court found Curtin incompetent and ordered psychiatric treatment (DE24).

- March 22, 2021 – Curtin arrived at Devens (DE80:1). The delay in transporting him there resulted from logistical challenges and a backlog at government psychiatric facilities. *See* (DE31:3; DE77:2-3).

- July 22, 2021 – Devens completed Curtin's treatment by the four-month mark and requested his transfer back to Miami, although he remained at Devens awaiting his return (DE77:4 & n.3).

- July 23, 2021 – Curtin moved to dismiss his indictment based on these delays (DE75).

- August 6, 2021 – The district court denied Curtin's motion but ordered Curtin's return to Miami (DE79).

17

- August 24, 2021 – After arranging a priority protective custody trip for Curtin, the Marshals Service flew Curtin back to Miami (DE80:3-4; DE83:1).

- September 13, 2021 – The parties received the psychiatric report saying that Curtin's competency was restored (DE241:5-6).

- September 15, 2021 – The court found Curtin competent (DE243:3-4).

Curtin argued that the Bureau of Prisons violated § 4241(d)(1)'s time limit when it held him at Devens for assessment for more than four months (DE75:8). For purposes of his motion, Curtin "agree[d] that the four-month period authorized under § 4241(d)(1) began on March 22, 2021, and ended on July 22, 2021" (DE78:2). He also faulted Devens for not issuing its report addressing his competency by that date, suggesting that the deadline for submitting that report was the same as the deadline for completing the assessment (DE75:4).

Curtin then requested several remedies, starting with "immediate discharge from FMC Devens and return to FDC Miami" (DE75:10). Next, he insisted that the court should dismiss his case because, if he was still incompetent, then the government could not prosecute him (DE75:11). Curtin conceded that "§ 4241(d) does not mandate dismissal of charges" or "contain any other explicit instruction for the method by which criminal charges are to be resolved once incompetency has been established" (*id.*). But he argued that

18

"the statutory scheme . . . suggests that dismissal and release are the appropriate" remedies for missing the four-month deadline (DE75:13).

The government accepted that Curtin's continued custody at Devens was improper. But Curtin had not justified the extreme remedy of dismissing his case (DE77:6-10). As a general matter, courts reserved dismissal for egregious Due Process violations (DE77:6-7). Keeping Curtin in psychiatric custody beyond a statutory time limit fell short of the mark. Section 4241(d)(1) was a "time-related directive"—a provision that sets a deadline but "do[es] not deprive a judge . . . of the power to take the action to which the deadline applies if the deadline is missed" (DE77:7-8) (quoting *Dolan v. United States*, 560 U.S. 605, 610-11 (2010)). Like other time-related directives, the statute did not "provide a remedy for a violation of its time provision," and courts should not "impose their own coercive sanction" (DE77:9 (internal quotation marks omitted)).

In any event, Curtin was not detained solely under § 4241; he also was being held under the Bail Reform Act (DE77:14). Citing *United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008), the government argued that Curtin's detention did not violate Due Process, even if it exceeded § 4241's time limits, because a separate order authorized his detention under the Bail Reform Act (DE77:14-19).

The court denied Curtin's motion and addressed three questions: first,

19

whether Curtin's continued detention at Devens violated § 4241(d)(1); second, whether the Bureau of Prisons needed to submit its report on Curtin's competency by § 4241(d)(1)'s four-month deadline; and third, whether dismissal was the right remedy for either alleged violation (DE79).

The parties did not dispute the first issue. Curtin's "hospitalization beyond four months at FMC Devens violate[d] the statute" (DE79:3 (footnote omitted)). Even though Devens was no longer assessing him and was only waiting for the Marshals to move him back to Miami, that custody was "without authority under section 4241(d)(1)" (DE79:4).

Turning to the second question, the court held that Devens's time for assessing Curtin's competency was "not the same" as its time for reporting its findings to the parties and the court (DE79:4-6). The statute did not require the facility to submit its report within four months (DE79:6).

Since Curtin's custody at Devens exceeded the deadline, the court considered how to remedy the situation (DE79:6-10). Applying *Dolan*, the court held that § 4241(d)(1) was a time-related directive (DE79:7). "Because the four-month time limit [was] not jurisdictional, dismissal [was] inappropriate" (DE79:8). Instead, the court ordered that Curtin "must be transferred back to FDC Miami" (DE79:9). The Marshals Service returned Curtin several weeks

20

later (DE83:1).[5]

## B.  Dismissal Was Not the Right Remedy for Missing § 4241(d)(1)'s Deadline.

Curtin criticizes the court's ruling but misses its core point. Although he argues at length that his detention violated § 4241(d)(1)'s deadline (Br.:33-40), the parties did not dispute that matter below. The court agreed, but ruled that dismissal was not the right way to redress the blown deadline. Because he does not show that dismissal was appropriate, this Court should affirm.

A defendant must be competent to face criminal charges. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). If a court finds that a defendant is incompetent, it may try and restore him to a sound state of mind. But a court can hold a person only for a "reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

In federal cases, 18 U.S.C. § 4241 addresses these concerns. Courts must order competency evaluations whenever there is "reasonable cause to believe" that the defendant cannot "understand the nature and consequences of the

---

[5] With a small exception, the parties agree on the relevant dates. Curtin claims that it took "nearly two months" for him to be returned to Miami, and he places that event in mid-September 2021 (Br.:38). The government's status reports reflect that he was back in Miami by August 24, 2021 (DE83:1), 18 days after the court ordered his return.

proceedings against him" or "assist properly in his defense." 18 U.S.C. § 4241(a). If the court finds the defendant incompetent, then the court "shall commit the defendant to the custody of the Attorney General," who "shall hospitalize the defendant for treatment in a suitable facility." *Id.* § 4241(d). Congress imposed two time limits on this hospitalization. First, a defendant may be assessed for "a reasonable period of time, not to exceed four months, . . . to determine whether there is a substantial probability that in the foreseeable future he will attain the [needed] capacity." *Id.* § 4241(d)(1). Second, hospitalization may continue "for an additional reasonable period of time until" the defendant is restored to competency, "if the court finds that there is a substantial probability" that treatment will succeed. *Id.* § 4241(d)(2)(A). Although § 4241(d) imposes these time limits—four months for assessment and a reasonable time for treatment—it does not provide penalties for exceeding them.

Again, the parties agree that Devens held Curtin for more than four months. Thus, the key question is whether to impose a judicially created penalty—dismissal, one of the harshest sanctions—because logistical issues delayed Curtin's departure from psychiatric custody.

Statutory deadlines come in three flavors, and each carries different remedies. *See Dolan*, 560 U.S. 605. The strictest rules are jurisdictional bars, which strip a court of power to hear a case after a missed deadline. *Id.* at 610.

22

Other statutes create "claims-processing rules" that do "not limit a court's jurisdiction but rather regulate the timing of motions or claims brought before the court." *Id.* Notice-of-appeal deadlines offer a classic example. They are not jurisdictional, yet they "assure [dismissal of an untimely appeal] to a party properly raising them." *United States v. Lopez*, 562 F.3d 1309, 1314 (11th Cir. 2009) (internal quotation marks omitted). If § 4241(d)(1) fell into either of these categories, then dismissal might be the right response to missing the four-month assessment deadline.

The final, least stringent category are "time-related directive[s]," which are "legally enforceable" but "do[] not deprive a judge or other public official of the power to take the action to which the deadline applies if the deadline is missed." *Dolan*, 560 U.S. at 611. The *Dolan* Court described several ways to distinguish time-related directives from other timeliness rules, and those factors confirm that § 4241(d)(1)'s four-month assessment period is a time-related directive.

First, "where, as here, a statute does not specify a consequence for noncompliance with its timing provisions, federal courts will not in the ordinary course impose their own coercive sanction." *Dolan*, 560 U.S. at 611 (internal quotation marks omitted). As the district court observed, § 4241(d)(1) "offers no remedy for a violation of its time provision" (DE79:8). Curtin highlights that the

statute uses the mandatory term "shall," but *Dolan* parries that point: "a statute's use of that word alone has not always led this Court to interpret statutes to bar judges (or other officials) from taking the action to which a missed statutory deadline refers." 560 U.S. at 611-12.

Second, the statute's purpose is not to short-circuit cases after four months. *See id.* at 612-14. In *Dolan*, for example, the disputed statute set a 90-day time limit for ordering restitution. The Court held that this deadline did not foreclose untimely restitution orders because the law's overarching purpose was to ensure prompt relief for victims. *See id.* Similar logic applies here. Section 4241's purpose is to try, if possible, to restore a defendant to competency—in other words, to preserve the ability to prosecute him—within a reasonable time. The act strikes a balance between respecting the defendant's Due Process rights and ensuring that justice is done.

Third, courts treat other similar timing rules the same way. For example, the Bail Reform Act has specific time limits for when a detention hearing must occur. *See* 18 U.S.C. § 3142(f). Yet those rules are time-related directives: "fail[ing] to comply with the first appearance requirement does not defeat the Government's authority to seek detention of the person charged." *United States v. Montalvo-Murillo*, 495 U.S. 711, 717 (1990); *see also Dolan*, 560 U.S. at 614-15 (discussing *Montalvo-Murillo*). *Montalvo-Murillo* is particularly instructive because

24

the same interests were at stake. Holding a defendant too long before his bail hearing also implicates his Due Process rights. *See* 495 U.S. at 723 (Stevens, J., dissenting). Yet a defendant is not entitled to automatic release to make up for a missed deadline.

Fourth, "the defendant normally can mitigate any harm that a missed deadline might cause." *Dolan*, 560 U.S. at 615. This case illustrates the point. Curtin moved the court to release him from Devens one day after the four-month period expired, secured an order for his release within two weeks, and was back in regular custody in about a month. Thus, § 4241(d)(1) served its purpose: it gave Curtin a statutory hook to demand his transfer back to Miami, and for the court to expedite his transfer. Because § 4241(d)(1) is a time-related directive, however, the district court correctly declined to dismiss the case. *Cf. United States v. Shelley*, 405 F.3d 1195, 1202 (11th Cir. 2005) (although courts have the supervisory power to dismiss an indictment, it "is an extreme sanction" reserved mostly for "egregious, flagrant" prosecutorial misconduct).

Curtin's counterarguments are unpersuasive or nonexistent. Although the district court rested its decision on *Dolan* (DE79:6-8), Curtin never rebuts the trial court's reasoning or analyzes *Dolan*. And none of his cited appellate decisions (which pre-date *Dolan* by decades) hold that it is proper to dismiss criminal charges for missing these deadlines. For example, in *United States v.*

*Donofrio*, the issue was not a missed deadline. That defendant tried to cut the process short before the assessment phase by proving his permanent incompetency at his initial § 4241(c) hearing. *See* 986 F.3d 1301, 1302-03 (11th Cir. 1990). Thus, when this Court described the assessment period as "mandatory," *id.*, it meant that it was unavoidable. *Donofrio* never says or suggests that dismissal must follow if that custody extends for too long.

Curtin offers one more criticism: in his view, the district court erred by assuming that the four-month assessment period stretched from March to July 2021, rather than starting in November 2020 when he was found incompetent (Br.:39). Yet this claim is irrelevant. The district court ruled that his detention exceeded § 4241(d)(1)'s time limit. How much extra time elapsed—one month or five months—does not change whether § 4241(d)(1) is a time-related directive.

In any event, Curtin caused this purported error, so this Court should not consider it under the invited-error doctrine. "The doctrine stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal." *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009). In his district court reply, Curtin said that "the parties agree that the four-month period authorized under § 4241(d)(1) began on March 22, 2021, and ended on July 22, 2021" (DE78:2). Following his lead, the court ruled

in his favor that his custody violated § 4241(d)(1). *See* (DE79:3 (Curtin "is correct" that "his hospitalization . . . violates the statute")). The court never had to decide the exact date when the time expired; instead, it "assume[d] the four-month period expired" in July 2022 based on the parties' agreement (DE79:3 & n.2). Yet Curtin complains now that the court assumed facts that he urged it to accept, to rule as he urged it to rule.[6]

Finally, he is wrong. The plain text limits the time that the Attorney General can "*hospitalize* the defendant for treatment *in a suitable facility*." 18 U.S.C. § 4241(d)(1) (emphases added). The time a defendant spends waiting to be transferred to a psychiatric facility like Devens is not time spent hospitalized in that facility, so it does not count. The clock ran—just as the parties asked the court to assume—from the date that Curtin was hospitalized at Devens.

## III.  The Southern District Judge Did Not Plainly Err by Ruling on Pre-Trial Matters Before Curtin Asked for a Judge from Another District.

When Curtin asked the entire Southern District bench to recuse

---

[6] Curtin may respond that, in his original motion, he stated that he "does not waive his original argument that the four-month period authorized under § 4241(d)(1) should have begun on November 24, 2020" (DE75:8 n.3). But that stray footnote cannot save him for two reasons. First, he took a different position in his reply when he "agree[d]" to the July 2022 date (DE78:2). Second, the more fundamental point is that the district court did not need to decide when the clock started because, either way, time had expired. When the court assumed the July 2022 date, it did not make any legal error. It merely declined to answer a question that the parties had not asked it to resolve.

themselves, they did so. Now, for the first time on appeal, he argues that recusal should have happened from the start. Thus, this Court should review his claim for plain error—as he recognizes (Br.:44-45). Under plain-error review, Curtin cannot prevail. Recusal is a fact-driven inquiry, so neither the governing statute nor case law compelled the Southern District judge to recuse herself.

The basic ground rules are well-known. A judge should recuse from "any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Recusal "turns on whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *In re Moody*, 755 F.3d 891, 894 (11th Cir. 2014) (internal quotation marks omitted). While doubts should "be resolved in favor of recusal," there is "as much obligation for a judge not to recuse when there is no occasion for [her] to do so as there is for [her] to do so when there is." *Id.* at 895 (internal quotation marks omitted). And "unsupported, irrational, or highly tenuous speculation" is not enough to force a judge off a case. *Id.* (internal quotation marks omitted).

Plain-error review helps simplify this analysis. To prevail, Curtin must show (1) an error (2) that was plain and (3) that affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 732-36 (1993). If he meets those conditions, then this Court may choose to correct the error if it "seriously affects the fairness,

28

integrity or public reputation of judicial proceedings." *Id.* at 736 (cleaned up).

Curtin cannot meet any part of this test, especially the second and third elements. "[W]here the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003).

Curtin searches for a foothold in *Moody*, claiming that decision compelled the first district judge to recuse herself (Br.:42-45). But *Moody* addressed far different circumstances, and Curtin misses one of its biggest lessons: "Recusal decisions under § 455(a) are extremely fact driven and must be judged on their unique facts and circumstances more than by comparison to situations considered in prior jurisprudence." 755 F.3d at 895 (internal quotation marks omitted). Thus, it is doubtful that any single past case could establish plain error here. And if one could, *Moody* is not the case to do it.

That decision arose from one the most tragic stories in this Court's history. Moody was convicted of a crime in the early 1970s and, as his appeals failed time and again, he grew enraged with the legal system. *See id.* at 893. In 1989, he used mail bombs to kill Eleventh Circuit Judge Vance and a civil rights attorney, while a third package was intercepted at the Eleventh Circuit's Atlanta courthouse. *Id.* When Moody was indicted for these crimes, all "judges then

29

sitting on the Eleventh Circuit" and the Northern District of Georgia recused themselves. *Id.* at 893-94 (citing *United States v. Moody*, 977 F.2d 1420 (11th Cir. 1992)).

Decades later, a different set of judges heard Moody's habeas petition and appeal. The question in *Moody* was whether the panel, composed of Eleventh Circuit judges from a generation after Judge Vance's murder, should still sideline themselves. The panel unanimously answered no. *See id.* at 895-98. Among other facts, the judges distinguished themselves from their predecessors by noting that they were not federal judges when the mail bombings happened, and that they did not "enjoy[] a close personal or professional relationship with Judge Vance." *Id.* at 895.

The panel then contrasted two decisions from other circuits. *See id.* at 896. In *In re Nettles*, 394 F.3d 1001 (7th Cir. 2005), the Seventh Circuit held that all Northern District of Illinois district judges should recuse from a case involving a threat to blow up their courthouse. On the other hand, the Ninth Circuit rejected an all-district recusal demand in *Clemens v. U.S. Dist. Ct. for the Central Dist. of Calif.*, 428 F.3d 1175 (9th Cir. 2005). Although that defendant had threatened three district judges from that court, the threat did not extend to every judge and so did not demand a blanket recusal. The *Moody* panel reasoned that a blanket recusal would be appropriate when all "judges were potential victims

30

of [an] attack" or threat. 755 F.3d at 896. That was why, they explained, "those judges sitting on the Eleventh Circuit at the time of Judge Vance's murder have recused themselves" from Moody's cases. *Id.* at 897. But the "only fact distinguishing [the panel judges] from a randomly-assigned panel comprised of judges from another circuit is that [they] happen to be assigned to the Eleventh Circuit, on which Judge Vance sat at the time of his death." *Id.* That fact was not enough to disqualify them. If someone harbored doubts that they could be fair, that "doubt would be based on the notion that federal judges might tend to view an attack on one as an attack on all." *Id.* Yet that logic "would extend to all federal judges—regardless of their circuit or district—and would, if disqualifying, prevent [the party requesting recusal] from having a[ny] federal forum." *Id.*

*Moody* thus does not dictate recusal under these facts. If anything, it suggests that the district court could have continued presiding over the case.

Unlike the judges who recused in Moody's cases, the Southern District trial judge and magistrate judges who presided over Curtin's criminal case were not threatened by Curtin. In the *Moody* cases, in contrast, many judges had to recuse because they could have been hurt if Moody's bomb sent to the Eleventh Circuit courthouse had detonated. For better or worse, Curtin targeted his ire at Magistrate Judge Maynard alone. This case bears a closer resemblance to

*Clemens*, cited with approval in *Moody*, in which the Ninth Circuit rejected requiring all judges from a district to recuse whenever a defendant threatened one (or, in that case, three) of their colleagues. 428 F.3d 1175. At most, Curtin "speculates . . . about personal relationships among the judges of the [Southern] District that might [lead] a reasonable observer to question the impartiality of the judges," but § 455(a) "does not require recusal based on speculation." *Id.* at 1180.

To paraphrase *Moody*, the "only fact distinguishing" the district judge "from a randomly-assigned" trial judge "from another [jurisdiction] is that [she] happen[ed] to be assigned to the" Southern District. 755 F.3d at 897. As Magistrate Judge Maynard testified, she does not work with every district judge on the Southern District bench (DE246:150). Thus, there was no guarantee of a close relationship between her and the assigned judge. And if Curtin suggests that all the district's judges would "view an attack on one [judge] as an attack on all," then that "doubt would extend to all federal judges—regardless of their circuit or district." *Moody*, 755 F.3d at 897.

Finally, Curtin has not shown how the supposed error affected his substantial rights. Because the judge recused when he asked, a Middle District judge presided over the most crucial stages of this case: his trial and sentencing. The main prejudice that Curtin identifies is that the first judge mishandled his

competency proceedings and motion to dismiss (Br.:47). Thus, this recusal claim rises and falls with the competency issues discussed in Part II. Since that decision was correct, there was no adverse effect on Curtin's substantial rights.

Because Curtin fails every prong of plain-error review, this Court should affirm.

## IV.    The District Court Did Not Clearly Err by Finding that Curtin's Threat Involved Some Deliberation.

### A.    Sentencing Background

Curtin's Presentence Investigation Report ("PSI") applied the 2018 Sentencing Guidelines Manual to calculate his advisory imprisonment range. To start, the PSI assessed a total offense level of 18 (PSI ¶¶ 18, 20, 26). Next, since he had no prior convictions, the PSI placed him in criminal history category I (PSI ¶¶ 36-37). His total offense level and criminal history category resulted in an advisory Guidelines range of 27 to 33 months' imprisonment (PSI ¶ 67).

The PSI also recounted Curtin's other inappropriate statements to judges (PSI ¶¶ 28-32). In 2005, he sent a federal judge a handwritten note saying, "[One] asks why Federal Judges' families are killed? The answer lies in the fact that it is evil that will destroy evil" (PSI ¶ 28). The note came less than a month after a disgruntled party murdered a federal judge's husband and mother (*id.*). Starting in 2005, Curtin also sent several letters referring to two Southern

33

District judges, J.L.K. and A.J. Curtin warned of "bombs to destroy the evil that is here," and asked at one point, "Can I have your permission to bring down to Miami a microwave/radio frequency device that would blow [J.L.K.]'s brains out of his head" (PSI ¶¶ 29-32).

Curtin objected to the PSI, asking the court to apply a 4-level decrease under USSG § 2A6.1(b)(6) (DE207). That paragraph applies to a single threat made with little or no deliberation. According to Curtin, his threat consisted of only "two sentences," which he did not repeat, and he never planned to carry out the threat (DE207:2). In his eyes, his crime was "an impulsive act . . . that was a reaction to [a] specific prior accusation" (DE207:3).

The government maintained that Curtin's crime "was the result of substantial deliberation" (DE208:2). He mailed his threat, which blunted any suggestion that it was a kneejerk reaction (*id.*). He also sent it six days after receiving the report and recommendation (DE208:3). He attacked the judge's character and tailored the threat to this specific victim (DE208:3-4). Finally, he tried to file it in person with the clerk's office, found it closed, and then mailed it (DE208:4).

The court began Curtin's sentencing hearing by discussing this issue (DE237:3-8). Although Curtin argued that his threat was thoughtless, the court found "the government's view to be the better view" and declined to apply

§ 2A6.1(b)(6) (DE237:7). Thus, the court adopted the PSI and found that the advisory Guidelines range was 27 to 33 months (DE237:9).

The court then heard from the victim and the parties. Magistrate Judge Maynard recounted that Curtin's threat was "a distressing and frightening situation for my family and I" (DE237:10). Her "father is a pastor, and the black pastor in the video [linked by Curtin] looks very much like him" (DE237:11). She stressed that Curtin needed to receive "mental health treatment and effective supervision" to ensure that he stops threatening judges (*id.*).

The government asked for a high-end, 33-month sentence with three years of supervised release (DE237:12). The government focused on Curtin's "history of threatening judges" and the facts of his current offense (DE237:13-19). Curtin also showed "a total lack of remorse," failing to acknowledge why Magistrate Judge Maynard felt frightened by his words (DE237:23).

Curtin sought a time-served sentence of 18 months (DE237:26). He did not deny sending messages to other judges, although he denied that they were threats (DE237:26-27). He asked the court to consider his mental health issues, including schizophrenia (DE237:31-32). And he insisted that his statements about Magistrate Judge Maynard were sarcastic (DE237:28). As for the video, he denied knowing that the victim's father was a pastor and chalked it up to coincidence (DE237:34).

When Curtin spoke, he offered excuses for his earlier letters to judges (DE237:39-40). Turning to this case, he described his conduct as writing "two complete sentences in my objections . . . that did not threaten anyone" (DE237:41). He claimed that he was being "sentenced for promoting the word of God just like Jesus was promoted for sentencing [sic] the word of God" (DE237:42).

After weighing the parties' statements and the 18 U.S.C. § 3553(a) factors, the judge chose "an upward variance [to] 60 months" in prison (DE237:46). "The reason why is this is a pattern" (*id.*). The court recapped Curtin's letters to other judges (DE237:46-47). The court also discussed his threat's racial dimension: "this is an older white gentleman threatening a young African-American female" (DE237:46). "[T]hat little reference was gratuitous and added to what was a clear threat" (*id.*). The judge identified two specific § 3553(a) factors—"the need to respect the law, which is grossly disrespected, and the need for public safety"—supporting his decision (DE237:47). The court also imposed the maximum three-year term of supervised release (*id.*). After Curtin objected to the variance, the judge reiterated that he "t[ook] everything" into account and chose his sentence "based upon the statutory factors," "the pattern" of conduct, and "the danger it involves and the injury to the people who receive such letters as, . . . 'I'm threatening you with death'" (DE237:50).

36

**B.    The District Court Did Not Clearly Err by Finding Curtin's Threat Involved Deliberation.**

Curtin's threat was not an off-the-cuff remark. Because it took deliberation, the district court did not clearly err by declining to apply USSG § 2A6.1(b)(6).

That adjustment gives a 4-level reduction to an offender who has no other § 2A6.1(b) enhancements and whose "offense involved a single instance evidencing little or no deliberation." USSG § 2A6.1(b)(6). Whether a threat involved deliberation is a classic factual question. Thus, under clear-error review, this Court should not overturn that finding unless it has a "definite and firm conviction that a mistake has been committed" after reviewing "the entire evidence." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (internal quotation marks omitted).

For three reasons, the district court did not clearly err by finding some deliberation behind Curtin's remarks.

First, conveying his threat through the mail showed forethought. This threat was not a heat-of-the-moment oral statement. *See, e.g.*, *United States v. Wright-Darrisaw*, 781 F.3d 35 (2d Cir. 2015). Someone who mails a threat is not making a split-second mistake. The act "involve[s] the deliberate securing of stationery and postage, the composition of a letter, the search for an address, and the act of taking the letter to be mailed." *United States v. Stevenson*, 126 F.3d

37

662, 665 (5th Cir. 1997) (affirming denial of this adjustment to a defendant who mailed his threat). The Fifth Circuit put it well: "There were many steps along the way in which [Curtin] could have stopped himself, but he didn't." *Id.*; *see also United States v. Stokes*, 347 F.3d 103, 106-07 (4th Cir. 2003) (same, for a defendant who "must have expended great effort in writing the letter because he has difficulty reading and writing").

Second, Curtin had several chances to reconsider his actions. As he admitted, a "few days went by" after he received the magistrate judge's report before "he wrote up these objections" (DE237:5). Also, he first tried to submit his document (including the threat) to the clerk's office, but it was closed (DE245:138-39; GX1:4). Some people might have taken that as a sign to rethink their plan. Curtin, however, carried through with his intentions.

Third, Curtin's words belied the notion that the threat was impulsive. Curtin did not start with his threat. Instead, he began by explaining why he was angry with Magistrate Judge Maynard before threatening her with death. Justifying a threat shows deliberation. *See United States v. Russell*, 322 F. App'x 920, 925 (11th Cir. 2009) (affirming deliberation finding because the defendant gave "detailed explanations of the motivations underlying his threat" before vowing to kill the President).

Curtin tries to narrow the focus to two factors from *Wright-Darrisaw*, 781

38

F.3d 35: (1) how often the defendant repeated the threat; and (2) whether the defendant planned or tried to carry the threat out (Br.:50). For one thing, that out-of-circuit opinion is not binding. For another, *Wright-Darrisaw* did not hold that those two factors were the only relevant considerations; it merely clarified that "the 'deliberation' to be considered under § 2A6.1(b)(6) . . . is deliberation related to the communication of the threat itself." 781 F.3d at 41. The problem in that case was that "the district court may have conflated the deliberation involved in making [a] phone call to the White House with the deliberation involved in communicating the specific threat against the President," which the defendant spontaneously uttered at the end of the call. *Id.* Because this case involves a mailed threat, this Court does not have the same issue: when Curtin decided to mail the letter, he was deciding to convey the threat. Thus, the trial court was free to weigh all relevant facts to assess whether Curtin's threat evinced no or little deliberation. Because the evidence supported the court's finding, this Court should affirm.

## V. Curtin's 60-Month Sentence Was Substantively Reasonable Because It Addressed His Pattern of Misconduct.

This Court assesses whether a sentence is reasonable under the 18 U.S.C. § 3553(a) factors and "the totality of the circumstances." *Gall v. United States*, 552 U.S. 38, 51 (2007); *see also United States v. Irey*, 612 F.3d 1160, 1189-90 (11th Cir. 2010) (en banc). A district court should impose a prison term that is "sufficient,

39

but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). A judge abuses his broad discretion only when he "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Irey*, 612 F.3d at 1189 (internal quotation marks omitted).

The same rules apply to upward variances. Courts should not presume that a sentence outside the Guidelines is unreasonable. *Gall*, 552 U.S. at 51. The relevant question is whether Curtin's 60-month sentence "lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (internal quotation marks omitted).

To be sure, the district judge imposed a substantial upward variance of 27 months over Curtin's Guidelines range. Yet he explained and supported that decision with sound reasoning. *See, e.g.*, *United States v. Scott*, 245 F. App'x 942, 945-46 (11th Cir. 2007) (affirming a 160-percent upward variance for a defendant who threatened a judge). Curtin's threat against Magistrate Judge Maynard was part of a larger pattern (DE237:46). Previously, Curtin wrote to a judge, "[One] asks why Federal Judges' families are killed? The answer lies in the fact that it is evil that will destroy evil" (PSI ¶ 28). Around that time, a former plaintiff had murdered a federal judge's husband and mother (*id.*). Curtin also

40

sent disturbing letters about two judges in the Southern District of Florida, which referred to "bombs" or radiation and asked for "permission to bring down to Miami a microwave/radio frequency device that would blow [a judge]'s brains out of his head" (PSI ¶¶ 29-32). Curtin's charges came after this "pattern escalated and it escalated" (DE237:46). The sentencing judge anchored these facts to two express § 3553(a) factors: the need to promote respect for the law and protect public safety (DE237:47); *see* 18 U.S.C. § 3553(a)(2)(A), (C).

The judge also weighed Curtin's racial remark—"[B]y holding onto the hand of the preacher of color . . . I am threatening Maynard who is a woman of color with death"—against him (DE237:46; GX1:3). The judge acknowledged the state's history of racial violence and described Curtin's references to race as "gratuitous and add[ing] to what was a clear threat" (DE237:46). It was reasonable to account for this factor when assessing the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).

Curtin criticizes three aspects of the court's decision, but none of them justify reversal.

First, he faults the court for stating that the word "glory" meant "heaven" (DE237:7-8). He says that it was improper for the court to rely on "personal knowledge" (Br.:53). But the court added, "I don't put any stead in it and don't base any sentence on it" (DE237:7). This Court should "take the district court

41

at its word," *United States v. Schwarzbaum*, 24 F.4th 1355, 1364 (11th Cir. 2022)—especially since the judge did not refer to this fact again when imposing the sentence.[7]

Second, he claims that the court gave too much weight to his earlier, uncharged threats (Br.:55, 57-58). He does not, however, dispute that he made those statements. A district court "may in its sound discretion attach great weight to one factor over others." *United States v. Isaac*, 987 F.3d 980, 995 (11th Cir. 2021) (internal quotation marks omitted). So the court did not abuse its discretion by weighing that pattern of disturbing conduct more heavily than other factors, like Curtin's mental health and age.

Third, Curtin goes further and insists that "none of [his personal characteristics] were considered in reaching [the] sentence" (Br.:56). Yet even he admits that the court discussed his health issues (Br.:56-57). When imposing the sentence, the court "recommend[ed] the lowest possible custody level and specifically instruct[ed] that the defendant has significant health issues that the Bureau of Prisons must address" (DE237:49). The judge also ordered mental health treatment as a supervised release condition (DE237:47). Then, when

---

[7] In any event, a judge can rely "on common sense and ordinary human experience" at sentencing. *United States v. Philidor*, 717 F.3d 883, 885 (11th Cir. 2013).

counsel objected, the court reiterated that it was "very aware of his health" and "if it weren't for that he would have gotten a higher sentence" (DE237:50). Thus, the court did consider these features. It just did not weigh them as heavily as Curtin would have liked—which does not establish an abuse of discretion.

Threatening judges imperils our system of government. This country's proud tradition of an "independent judiciary" demands that judges be "free from potential domination" or "improper influence." *United States v. Will*, 449 U.S 200, 217-18 (1980). And that includes fear of violent retaliation from disgruntled parties. The district court calibrated Curtin's sentence to address the serious harms that his threat caused—not just to the victim, but to the justice system.

## Conclusion

For these reasons, this Court should affirm Curtin's convictions and sentence.

Respectfully submitted,

Juan Antonio Gonzalez
United States Attorney

By:    s/ *Jason Wu*
Jason Wu
Assistant United States Attorney
99 N.E. 4th Street, #500
Miami, FL 33132
(305) 961-9226
Jason.Wu@usdoj.gov

Lisa Tobin Rubio
Chief, Appellate Division

Brittany Bull Panuccio
Assistant United States Attorney

Of Counsel

44

**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,777 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-based typeface using Microsoft Word 2016, 14-point Calisto MT.

**Certificate of Service**

I hereby certify that four copies of the foregoing Brief for the United States were mailed to the Court of Appeals via Federal Express this 10th day of August, 2022, and that, on the same day, the foregoing brief was filed using CM/ECF and served via CM/ECF on Bernardo Lopez, Assistant Federal Public Defender, Attorney For Appellant Curtin.

_s/ Jason Wu_____
Jason Wu
Assistant United States Attorney

*ab*