NO. 22-10509-J

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————————

## UNITED STATES OF AMERICA,
*Appellee,*

**v.**

## LAWRENCE CURTIN,
*Appellant.*

———————————

## On Appeal from the United States District Court
## for the Southern District of Florida

———————————

## REPLY BRIEF OF THE APPELLANT
## LAWRENCE CURTIN

———————————

**MICHAEL CARUSO**
  **Federal Public Defender**
**Bernardo Lopez**
  **Assistant Federal Public Defender**
  **Attorney For Appellant Curtin**
  **1 E. Broward Blvd., Suite 1100**
  **Fort Lauderdale, Florida 33301**
  **Telephone No. (954) 356-7436**

## THIS CASE IS ENTITLED TO PREFERENCE
## (CRIMINAL APPEAL)

---

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States v. Lawrence Curtin
### Case No. 22-10509-J

Pursuant to 11th Cir. R. 26.1-2(b), undersigned counsel certifies that the certificates of interested persons previously filed in this appeal are accurate and complete.


*s/Bernardo Lopez*
Bernardo Lopez

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

　　DISCLOSURE STATEMENT ...................................................... C-1

TABLE OF CITATIONS ......................................................... iii

REPLY ARGUMENT AND CITATIONS OF AUTHORITY ................... 1

I.　　The Government failed to prove beyond a reasonable doubt that Mr. Curtin intended to issue a real threat against Judge Maynard or that Mr. Curtin knew that his communications would be viewed as a threat by Judge Maynard. ........................... 1

II.　　The district court erred when it denied Mr. Curtin's motion to dismiss the superseding indictment where Mr. Curtin was detained for evaluation and treatment by the Attorney General beyond the term of hospitalization authorized by statute ............................................................................. 5

III.　　The District Court for the Southern District of Florida erred as a matter of law when it failed to sua sponte recuse itself from deciding any material issues in Mr. Curtin's prosecution for threatening a Southern District of Florida federal magistrate judge where the District Court for the Southern District of Florida decided substantive issues such as bond, competency and motions to dismiss the indictment against Mr. Curtin while Mr. Curtin remained imprisoned for almost a year before the prosecution was transferred to the Middle District of Florida ......................................................... 12

CONCLUSION ....................................................................... 19

CERTIFICATE OF COMPLIANCE..........................................................20

CERTIFICATE OF SERVICE................................................................21

# TABLE OF CITATIONS

**Cases:**

*In Re Moody*,

    755 F.3d 891 (11th Cir. 2014) .................................................. 14, 18

*Jackson v. Indiana*,

    406 U.S. 715 (1972) ........................................................ 11

*United States v. Kelly*,

    888 F.3d 732 (11th Cir. 1989) ......................................... 14

*United States v. Magassouba*,

    544 F.2d 387 (2d Cir. 2008)........................................... 10

## <u>Statutory and Other Authority</u>

18 U.S.C. § 3142(e)(3)(A) ........................................................ 11

18 U.S.C. § 4241 ..................................................... 6, 7, 8, 11, 17

18 U.S.C. § 4241(d)........................................................... 6, 7

28 U.S.C. § 455(a) ........................................................ 13, 18

## REPLY ARGUMENT AND CITATIONS OF AUTHORITY

I. **The Government failed to prove beyond a reasonable doubt that Mr. Curtin intended to issue a real threat against Judge Maynard or that Mr. Curtin knew that his communications would be viewed as a threat by Judge Maynard.**

In its brief, the government focuses exclusively on Mr. Curtin's words "I am threatening Maynard with death and bodily harm," and declares that Mr. Curtin's statement was "threatening on its face." (Government's Brief at 10-12). The Government argues that anything else written or attached by Mr. Curtin to those words cannot negate the meaning of those words and incorrectly characterizes Mr. Curtin's argument as "a death threat loses its bite when accompanied by something innocuous." (Government's Brief at 12-13). That is incorrect.

Mr. Curtin's argument is simply that the Court must look at Mr. Curtin's entire statement to determine whether the government presented sufficient proof beyond a reasonable doubt that Mr. Curtin intended to issue a threat or knew that his communications would be viewed as a threat. For example, take a look at two different statements.

In the first statement, an individual announces: "I am making it absolutely clear that I am threatening the Judge with death and bodily harm." In the second statement, an individual announces: "There is absolutely no way that I am threatening the Judge with death and bodily harm." Both statements contain the phrase "I am threatening the Judge with death and bodily harm," yet both statements have the exact opposite meaning. In fact, it is clear that the first statement, standing alone, would likely provide sufficient proof beyond a reasonable doubt that the individual making the statement intended to issue a threat or know that his communications would be viewed as a threat. In contrast, the second statement, standing alone, would be insufficient to prove, much less beyond a reasonable doubt, that the individual making the statement intended to issue a threat or know that his communications would be viewed as a threat. The full intent of the speaker can only be determined by viewing the entire statement and in context.

Here, Mr. Curtin provided a link to a scene from a movie, from when Mr. Curtin was much younger, in which Mr. Curtin was the star and director. The specific scene included a spiritual song. Mr. Curtin then stated:

> It is obvious from the totality of words in the song including its title I am threatening Maynard with death and bodily harm. Also by holding onto the hand of the preacher of color that I am threatening Maynard who is a woman of color with death.

This Court cannot, as the government suggests, simply focus on "I am threatening Maynard with death and bodily harm," without examining the rest of the statement including the words and title to the song. If the Court, in fact, examines Mr. Curtin's entire statement, then it will be clear that the government failed to prove beyond a reasonable doubt that Mr. Curtin intended to issue a threat or knew that his communications would be viewed as a threat.

The government also argues that even if the Court were to look at the video link provided by Mr. Curtin, it would prove that Mr. Curtin intended to issue a threat or knew that his communications would be viewed as a threat. However, the government relies on incorrect facts and faulty reasoning. The government makes much of the fact that Judge Maynard testified that her father was a preacher. In the movie clip Mr. Curtin's character shakes hand with the preacher and he notes in his statement that "by holding onto the hand of the preacher of color that I am threatening Maynard who is a woman of color with death." The

government concludes that the "chosen clip increased the victim's fear because of her background . . . a reasonable viewer could infer that Curtin was suggesting the he knew where to find the judge's father." (Government Brief at 13). The government also concludes that "[b]ecause the word 'glory' may refer to heaven, sending that video to a pastor's daughter could allude to her imminent death – exactly what [Mr.] Curtin threatened to deliver in the next two lines. (Government Brief at 13-14). The problem with the government's conclusions is that the government never presented any evidence demonstrating that it was common knowledge or public knowledge that Judge Maynard's father was a preacher. More importantly, the government never presented any evidence that Mr. Curtin knew or should have known that judge Maynard's father was a preacher. The government also failed to present any evidence that Mr. Curtin knew or intended for "glory" to mean heaven. Although it is well settled law that this Court views the evidence in the light most favorable to the government, including all reasonable inferences, the government fails to cite any authority for its proposition that this Court may rely on evidence that was never presented to the jury to affirm a conviction.

II. **The district court erred when it denied Mr. Curtin's motion to dismiss the superseding indictment where Mr. Curtin was detained for evaluation and treatment by the Attorney General beyond the term of hospitalization authorized by statute**.

In its brief, the government downplays Mr. Curtin's detention by the Attorney General pursuant to a finding that he was incompetent to stand trial acknowledging that the detention was "improper" but not an egregious Due Process violation warranting dismissal. (Government's Brief at 19). In the government's view, the question is simply "whether to impose a judicially created penalty – dismissal, one of the harshest sanctions – because *logistical issues* delayed [Mr.] Curtin's departure from psychiatric custody." (Government's Brief at 22) (emphasis added).

But that dismissive view ignores the reality of what occurred regarding Mr. Curtin's competency determination. First, it should be noted that from the start of the prosecution against Mr. Curtin, the focus was on Mr. Curtin's competency to stand trial. In fact, at the initial detention hearing, much of the discussion centered on Mr. Curtin's competency and mental health issues. (DE 233).

5

Most importantly however, by the government's own timeline, on November 24, 2020, the district court determined that Mr. Curtin was incompetent to stand trial and committed him to the custody of the attorney general.  (DE 24).  The government ignores the second part of that order even though the title of the order is "Order Finding the Defendant Incompetent to Proceed **and Committing Him to the Custody of the Attorney General**." *Id.* (emphasis added).  The order also noted the request by defense counsel that the competency treatment under 18 U.S.C. § 4241 be done at the Federal Detention Center in Miami.  The district court then expressly ordered:

> Pursuant to 18 U.S.C. § 4241(d), the Defendant, Lawrence Curtin, is committed to the custody of the Attorney General, who shall hospitalize the Defendant for treatment in a suitable facility, taking into account all of his medical issues, for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to proceed.

*Id.*    It is thus clear that on November 24, 2020, Mr. Curtin was committed to the custody of the Attorney General for treatment pursuant to section 4241.  It is also clear that Mr. Curtin was not returned to the custody of the U.S. Marshals until August 24, 2021 and that no report regarding Mr. Curtin competency was returned until September 13,

6

2021. On September 15, 2021, the district court found Mr. Curtin competent to stand trial. (Government's Brief at 17-18).

The statutory language is clear. Section 4241 specifies as follows:

If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, **the court shall commit the defendant to the custody of the Attorney General**. The Attorney General shall hospitalize the defendant for treatment in a suitable facility –

(1) For such a reasonable period, **not to exceed four months**, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; and

18 U.S.C. § 4241(d) (emphasis added). The statute clearly mandates that the district court shall commit the defendant to the custody of the Attorney General for a reasonable period not to exceed four months. That is it. Here, Mr. Curtin was committed to the custody of the Attorney General pursuant to section 4241 on November 24, 2020. He was not released from that custody until August 24, 2021 and he was not deemed competent until September 15, 2021. That nine-month period is more than double the four-month period allowed under the clear language of

section 4241.

The government also argues that, despite the fact that Mr. Curtin was ordered into the custody of the Attorney General based on a finding of incompetent to stand trial, he was already being held under the Bail Reform Act as a danger to the community and thus any delay in the competency restoration procedure was harmless. (Government Brief at 19-20). But, that argument again ignores what actually occurred in the district court.

Again, from the start of the prosecution against Mr. Curtin, the focus was on Mr. Curtin's competency to stand trial. In fact, at the initial detention hearing, much of the discussion centered on Mr. Curtin's competency and mental health issues. (DE 233). Counsel for Mr. Curtin noted that Mr. Curtin had been accused of a similar offense in state court, and that he had been released to his home with an ankle monitor for two years pending the outcome of that case without violating any conditions of release. In addition, the charges against Mr. Curtin were dismissed when Mr. Curtin was declared incompetent to stand trial. *Id.* at 16-17. The magistrate judge openly opined that a competency evaluation should be ordered, *id.* at 23, and that she found it difficult to consider any

8

conditions of release "that aren't completely tethered to competency evaluation," *id*. at 26. Even after finding that the government had met its burden on the limited record, the magistrate judge noted that it would reopen the hearing if there was any additional information to be presented especially with regard to Mr. Curtin's mental health. *Id*. at 34-37.

On October 19, 2020, the magistrate judge held a hearing on a motion for bond from Mr. Curtin. (DE 118). It appears clear from the statements by the judge at the hearing that the judge was contemplating granting a bond and allowing Mr. Curtin to return to his home. However, the judge was concerned that the pending finding of incompetent to stand trial would essentially moot or undue any bond. *Id*. at 18-21. Even when the court denied the motion for bond, the magistrate judge noted the possible changing circumstances and the possibility of a finding of incompetent stand trial. (DE 119: 32-25). As it turns out, the magistrate judge was correct. On October 27, 2020, a psychiatric doctor at the Federal Detention Center filed a report finding that Mr. Curtin was incompetent to stand trial and counsel for Mr. Curtin stipulated to that finding. (DE 20). Soon after, the magistrate judge determined that Mr.

9

Curtin was not competent to proceed and ordered Mr. Curtin committed to custody of the Attorney General for hospitalization "not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to proceed." (DE 24).

Even the case cited by the government, *United States v. Magassouba*, 544 F.3d 387 (2d Cir. 2008), underscores the error in the government's logic. Unlike Mr. Curtin's case, there was no initial concern regarding the defendant's competency in *Magassouba*. In fact, as the Second Circuit pointed out in its opinion, the defendant, who was not a citizen of the United States, was ordered detained under the bail reform act. *Id*. at 393. A few months later, a different attorney was appointed to represent the defendant and two months after that, for the first time, counsel raised concerns about the defendant's competence to stand trial. *Id*. Even then, the Second Circuit stressed that "[a]t no time in the district court did past or present counsel challenge the [ ] detention order or seek its amendment." *Id*. Finally, it should be noted that the defendant in *Magassouba* was charged with distribution of a kilogram or more of heroin, which not only carries a ten-year mandatory minimum,

10

but also creates a presumption under the bail reform act that the individual must be detained. *See id.*; *see also* 18 U.S.C. § 3142(e)(3)(A). Here, in stark contrast, the prosecutor informed the court that there was no presumption under the bail reform act, Mr. Curtin faced no mandatory minimum sentence, and that the advisory sentencing range was just 10-16 months. (DE 233:5).    Thus, the argument raised on appeal by the government suggesting that Mr. Curtin would have been detained absent a finding of incompetent to stand trial is refuted by the facts and proceedings in the district court.

Regardless of whether the four-month period mandated by 18 U.S.C. §4241 is considered to have started when the district court ordered Mr. Curtin committed to the custody of the Attorney General or when he arrived at the medical facility, the district court's denial of Mr. Curtin's motion to dismiss the indictment was reversible error.  "At least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). Section 4241's four-month limitation serves, at least, as a presumptive limit on what due process will allow.  Here, Mr. Curtin was clearly detained beyond that four-

month limitation.  Mr. Curtin spent nearly six months in a medical facility, and Mr. Curtin was detained for nearly ten months total after he had been committed to the custody of the Attorney General for treatment via a judicial order.  And at the time, the best estimate from the government was that Mr. Curtin's advisory sentencing range was 10 to 16 months.  Given the clear violation of Mr. Curtin's due process rights, the district court erred as a matter of law when it denied his motion to dismiss the indictment against him.  Based on that due process violation, this Court must now vacate Mr. Curtin's conviction and remand with instructions to dismiss the charges against him.

III.  **The District Court for the Southern District of Florida erred as a matter of law when it failed to *sua sponte* recuse itself from deciding any material issues in Mr. Curtin's prosecution for threatening a Southern District of Florida federal magistrate judge where the District Court for the Southern District of Florida decided substantive issues such as bond, competency and motions to dismiss the indictment against Mr. Curtin while Mr. Curtin remained imprisoned for**

**almost a year before the prosecution was transferred to the Middle District of Florida.**

Mr. Curtin concedes, as he did in his initial brief, that he failed to move for recusal and thus this Court must review the failure of the district court to recuse itself for plain error. But, the express language of the statute, which requires mandatory recusal, and this Court's controlling precedent, leads to the inevitable conclusion that the district court plainly erred by failing to recuse itself as required by 28 U.S.C. § 455(a). Mr. Curtin's argument boils down to the unremarkable rule that if a criminal defendant is charged with threatening to, or attempting to, kill a federal judge in a district, the other judges in that district must recuse themselves from that criminal case.

Again, the statutory language is clear and straightforward: "[a]ny . . . judge . . . of the United States **shall** disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (emphasis added). This Court's controlling precedent makes it clear that judges must *sua sponte* recuse themselves to avoid "even the appearance of impropriety whenever possible." *United States*

13

*v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989). "Any doubts must be resolved in favor of recusal." *In Re Moody*, 755 F.3d 891, 895 (11th Cir. 2014).

Here, Mr. Curtin was prosecuted for threatening to kill a federal judge in the Southern District of Florida. The impartiality of any other federal judge in the district to make substantive decisions regarding Mr. Curtin such as whether he should be detained, whether he is a threat to the community, whether he is competent to stand trial and where he should be allowed to receive treatment to attempt to restore his competence, "might reasonably be questioned." That questionable impartiality can easily be seen at the pretrial detention hearing and at the hearing on Mr. Curtin's request for a reconsideration of the detention order and the issuance of a reasonable bond.

At the pre-trial detention hearing, the government made clear that it was seeking detention solely on the basis that, in the government's view, Mr. Curtin was "a danger to Judge Maynard" and "that there are no conditions that would reasonably assure Judge Maynard's safety while he's on this bond." (DE 233: 31-32). At the hearing on Mr. Curtin's request to reconsider the detention order and to grant a reasonable bond, the improper focus on Judge Maynard became more apparent. At the

initial hearing on October 19, 2020, the magistrate judge asked the prosecutor to determine Judge Maynard's position about the case with regard to the issues before the magistrate judge: detention, a possible bond and the consequences if Mr. Curtin was found incompetent. (DE 118:8-9). On October 21, 2020, the prosecutor announced in open court that she had reached out to Judge Maynard to get Judge Maynard's position on those issues. (DE 119:5). The prosecutor conceded that "typically the Government does not actually reach out to victims for their considerations as to bond or pretrial detention." *Id.* Yet, the government made the inquiry of Judge Maynard and, according to the prosecutor, Judge Maynard stated her position on Mr. Curtin's case which the prosecutor relayed as follows:

> [Judge Maynard] does want Mr. Curtin detained and does feel much more safer and comfortable with him being detained, which she expressed to me, Your Honor, was that when she received this threat – and I didn't know this and Mrs. Lopez who had handled the complaint before I got on the case didn't know this either and I don't think anybody from the Government knew this. When she received the complaint, which she explained to me that Fort Pierce is a very small community, and that her father is probably the most well-known black pastor in Fort Pierce. And when she saw the threat and she saw the link to the video, which she said she could only stomach watching for a short period of time, it really, really bothered her because she felt that the Defendant had done some research about her family having sent a link

15

about specifically a black pastor.  She is of the black race and she said that her father is a very well-known black pastor in the community.  So she took this, aside from being just a threat to a Judge and, you know, her profession and her sitting on various proceedings that Mr. Curtin has filed motions and complaints in, she took this personal.  She took the threat very seriously.

\* \* \*

She said since the threat she initially had a police detail at her home.  And since he has been detained, she was issued a police radio and that she could use for emergency purposes.  She has felt relieved that he has been detained.  And hasn't had to focus on using that, but that just this week she plans on having a full alarm system put into her home.  And that if he is released, she does want us to apprise her of that so that so that she and her family can plan accordingly.  Judge Maynard also relayed to me her considerations on how the case should proceed. . .

(DE 119: 6-7).    At that point the magistrate judge interjected and the prosecutor assured the magistrate judge that Judge Maynard was aware that her position would be conveyed in open court to the magistrate judge and Judge Maynard "knows this is taking place and she knows precisely why I am asking," adding that as a former federal prosecutor, Judge Maynard "was very much aware of this hearing and why I was asking and what I was going to be proffering to the Court."  *Id*. at 7-8.  The prosecutor then went on to express Judge Maynard's specific view on how Mr. Curtin's prosecution should proceed:

Judge Maynard did offer her input as victim how she felt about that, if he is deemed incompetent what she would like for us to do. And she did state that she does not want the case to be treated as it was in the state system. Meaning, she does not want it to just be dismissed. That she does want the process of 4241 followed through. And she highlighted the fact that, you know, once he was deemed incompetent at the state court level in May, a month later he was threatening her. And that this is just repeated conduct and behavior that he needs treatment for and it needs to be addressed. And you know, just a little bit disturbing that he tows all the way up to the line of making these treats and, you know, going through the competency proceedings and then the case is not followed through with. So our office will proceed forward and we would ask him to submit to treatment and restoration whether that's at Butner or another facility. There are other facilities he can go to if Miss Bharathi's main consideration is the condition of Butner, but that would be how we would proceed with the case.

*Id.* at 8-9.

Not surprisingly, the magistrate judge ended up doing exactly what Judge Maynard requested be done. The magistrate judge made a finding that the government had presented clear and convincing evidence that Mr. Curtin presented a serious risk to Judge Maynard. The magistrate judge also made a finding that no condition or combination of conditions would make Judge Maynard safe enough. The judge made those factual findings despite these uncontroverted facts: Mr. Curtin was a 77-year-old man with serious medical and mental health issues; Mr. Curtin had no

17

history of any violence; his prior charge of making threats on a judge were dismissed based on the fact that he was incompetent to stand trial; on that charge, Mr. Curtin was released pre-trial for two years without any incident; Mr. Curtin was facing a federal sentence of 10-16 months; a grand jury would not be convened for at least three or four months.

It is clear that the magistrate judge put substantial weight on Judge Maynard's demands. And, even by the prosecutor's own admission, Judge Maynard's view is something that would normally not be solicited let alone made the central argument in favor of detention. At a bare minimum, it is clear from that hearing that the impartiality of the magistrate judge could "reasonably be questioned." *See* 28 U.S.C. § 455(a). Under the clear language of the statute and this Court's controlling precedent, it was pain error for the district court not to *sua sponte* recuse itself from making any substantial decision in Mr. Curtin's case. *See* 28 U.S.C. § 455(a); *see also Moody*, 755 F.3d at 894-896.

## CONCLUSION

Based on the foregoing, this Court must vacate the judgment of the

district court and remand the matter to the district court.


MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER


*/s/ Bernardo Lopez*
Bernardo Lopez
Assistant Federal Public Defender
Attorney For Appellant Curtin
One E. Broward Blvd., Suite 1100
Fort Lauderdale, Florida 33301
Telephone No. (954) 356-7436

**CERTIFICATE OF COMPLIANCE**

I CERTIFY that this brief complies with the type-volume limitation and typeface requirements of Fed. R. App. P. 32(a)(7)(B), because it contains 3999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Century Schoolbook.


*/s/ Bernardo Lopez*
Bernardo Lopez
Assistant Federal Public Defender

20

**CERTIFICATE OF SERVICE**

I HEREBY certify that on this 20th day of September, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent four copies to the Clerk of the Court via third party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Lisa Tobin Rubio, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.

For counsel of record who have not registered for CM/ECF and pro se parties, the foregoing document has been served by U.S. Mail.

s/ *Bernardo Lopez*
Bernardo Lopez
Assistant Federal Public Defender